**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EMANUEL GODINEZ-PEREZ,

    Defendant - Appellant.

No. 15-3159
(D.C. No. 2:14-CR-20066-JAR-1)
(D. Kan.)

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE** and **MURPHY**, Circuit Judges.
_____

This matter is before the court on the Petition for Panel Rehearing and Rehearing

En Banc filed by Defendant - Appellant, Emanuel Godinez-Perez.

Pursuant to Fed. R. App. P. 40, the petition for panel rehearing is granted in part to

the extent of the modifications in the attached revised opinion. The court's October 24,

2016 opinion is withdrawn and replaced by the attached revised opinion.

The petition for rehearing en banc and the attached revised opinion were

transmitted to all of the judges of the court who are in regular active service. As no

member of the panel and no judge in regular active service on the court requested that the

court be polled, the petition for rehearing en banc is denied. *See* Fed. R. App. P. 35(f).

Entered for the Court
ELISABETH A. SHUMAKER, Clerk

by: Chris Wolpert
Chief Deputy Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

EMANUEL GODINEZ-PEREZ,

      Defendant - Appellant.

No. 15-3159

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:14-CR-20066-JAR-1)**

---

Melody Brannon, Federal Public Defender, District of Kansas, Topeka, Kansas, for Defendant-Appellant.

Carrie N. Capwell, Assistant United States Attorney, (Barry R. Grissom, United States Attorney, with her on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE** and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

      Defendant Emanuel Godinez-Perez (Godinez) pleaded guilty to three criminal counts arising out of his role in a conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine. The district

court sentenced Godinez to a term of imprisonment of 108 months, to be followed by a two-year term of supervised release. Godinez now appeals his sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we agree with Godinez that the district court erred in calculating his base offense level and, in turn, his advisory Guidelines sentencing range. Specifically, the court erred in failing to make particularized findings regarding relevant conduct attributable to Godinez. Consequently, we remand to the district court with directions to vacate Godinez's sentence and resentence him.

I

A

In June and July of 2014, law enforcement agents from the Kansas Bureau of Investigation (KBI) and the United States Department of Homeland Security-Homeland Security Investigations (HSI) used a confidential informant (CI) to make two controlled purchases of methamphetamine from an individual named "Manuel" in Kansas City, Kansas. Law enforcement agents ultimately determined that "Manuel" was Godinez and they arrested him, along with Jose Menera-Alvarez and Gilbert Cano-Bahena, both of whom were involved with Godinez in the distribution of the methamphetamine. During the course of the investigation, law enforcement agents seized ten different quantities of methamphetamine, totaling approximately 1,505.26 grams. Laboratory testing revealed that these quantities of methamphetamine ranged in purity from 96.1% to 100%. Based

2

upon these purity figures, the net weight of the methamphetamine was estimated to be 1,479.8 grams.

B

On July 25, 2014, a criminal complaint was filed charging Godinez, Menera-Alvarez, and Cano-Bahena with conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846, and 18 U.S.C. § 2, and possession with the intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), 846, and 18 U.S.C. § 2. The complaint also alleged two separate counts of distribution solely against Godinez. On August 6, 2014, a federal grand jury returned an indictment setting forth the same four charges.

On January 22, 2015, Godinez appeared before the district court and entered a plea of guilty, without benefit of a plea agreement, to the charges against him. The district court directed the probation office to prepare a presentence investigation report (PSR).

On April 27, 2015, the probation office submitted the PSR to the district court and the parties. The PSR concluded that Godinez's "offense involv[ed] at least 1.5 kilograms but less than 4.5 kilograms of 'Ice'" (high-grade methamphetamine), and thus assigned Godinez a base offense level of 36, pursuant to U.S.S.G. § 2D1.1. ROA, Vol. 3 at 13. The PSR in turn applied a

3

two-level reduction pursuant to the safety-valve provision of U.S.S.G. § 2D1.1(b)(17), as well as two-level and one-level reductions pursuant to U.S.S.G. § 3E1.1(a) and (b), all of which resulted in a total offense level of 31. That total offense level, combined with the calculated criminal history category of I, resulted in an advisory Guidelines sentencing range of 108 to 135 months. Neither party filed objections to the PSR.

Godinez did, however, file a sentencing memorandum asking the district court "to sentence him to less than 60 months in the Bureau of Prisons." Id., Vol. 1 at 36. In support of his request, Godinez argued that he was "clearly the LEAST culpable of the three" defendants in the case because the other two were suppliers and Godinez "only had direct or indirect control over 601.57 of the 1505.39 grams of methamphetamine that comprise[d] his drug quantity calculation." Id. at 36, 38. More specifically, Godinez argued that "601.57 grams [we]re a result of actual sales by" him, and that "887.25 grams [we]re a result of the execution of a search warrant on a storage unit that did not belong to [him]," and was not "under his control." Id. at 37.

Godinez also argued in his sentencing memorandum that "[t]here [we]re more general reasons to consider a variance for [him]." Id. To begin with, he argued that "the methamphetamine guideline lacks empirical support," id., and "penalize[s] methamphetamine much, much more severely than any other drug," id. at 41. Second, Godinez argued that "the unique focus on methamphetamine

4

purity in [§] 2D1.1 further undermines the goals of [18 U.S.C. §] 3553(a)." Id. at 42. "For example," he argued, his "base offense level would have been 32 instead of 36 had the drug quantity been calculated as a mixture." Id. And, he argued, that would have "result[ed] in a sentence range of 70-87 months absent the differential calculation for drug purity." Id. Lastly, Godinez argued that his case was treated differently than other criminal prosecutions in the District of Kansas because the probation office in his case calculated the amount at issue "as 'Ice'" even though the "actual amount [wa]s available." Id. at 45.

On June 29, 2015, Godinez appeared before the district court for sentencing. The district court, again without objections from either party, adopted the PSR's sentencing calculations. Defense counsel asked the district court to vary downward from the advisory Guidelines sentencing range and impose a term of imprisonment of no greater than 60 months. The district court denied Godinez's request and sentenced him to 108 months' imprisonment, to be followed by a two-year term of supervised release.

Judgment was entered in the case that same day. Godinez filed a timely notice of appeal and challenges only his sentence.

II

*Determination of relevant conduct - drug quantity*

In his first issue, Godinez complains that "the district court made no particularized findings on the record about the relevant conduct attributable to

5

[him] individually, but instead held him responsible for the entirety" of the methamphetamine that was seized by law enforcement officials. Aplt. Br. at 8. Because Godinez did not raise this specific argument in the district court, our review is limited to plain error under Federal Rule of Criminal Procedure 52(b).[1] Molina-Martinez v. United States, 136 S. Ct. 1338, 1343 (2016). We "ha[ve] discretion to remedy a forfeited error provided certain conditions are met." Id. The defendant must establish (1) the existence of "an error that has not been intentionally relinquished or abandoned," (2) "the error [is] plain—that is to say, clear or obvious," and (3) "the error . . . ha[s] affected the defendant's substantial rights." Id. "Once these three conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (quotation marks omitted).

Godinez argues that the district court in this case was required to "make particularized findings about relevant conduct—here, the drug quantity and type—attributable to the defendant, rather than just default to the overall conspiracy." Aplt. Br. at 10-11. Godinez further argues that "the PSR failed to

---

[1] As we have noted, Godinez hinted at the issue in his sentencing memorandum by arguing that the 887.25 grams of methamphetamine that were seized as "a result of the execution of a search warrant on a storage unit did not belong to [him], nor [were those narcotics] under his control." ROA, Vol. 1 at 37. Ultimately, however, Godinez failed to object to the drug quantity calculations set forth in the PSR and adopted by the district court.

6

offer any particularized findings about individual relevant conduct," and the district court in turn "made no findings particular to the scope of [Godinez's] agreement, either as to quantity or type of methamphetamine." Id. at 11. And, he argues, "[t]he record does not support that [he] agreed to jointly undertake the distribution of more than 1.5 kilograms of [I]ce." Id.

Section 1B1.3 of the United States Sentencing Guidelines, which addresses relevant conduct for purposes of sentencing, states that a defendant's base offense level "shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant," as well as, "in the case of a jointly undertaken criminal activity . . . , all acts and omissions of others that were . . . within the scope of the jointly undertaken criminal activity, . . . in furtherance of that criminal activity, and . . . reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(A) and (B). "This includes any controlled substance that was handled by another member of the conspiracy if it was '(A) in furtherance of the jointly undertaken criminal activity; and (B) reasonably foreseeable in connection with that criminal activity.'" United States v. Figueroa-Labrada, 720 F.3d 1258, 1265 (10th Cir. 2013) (quoting U.S.S.G. § 1B1.3, cmt. n.2).

Application Note 3(B) to § 1B1.3 states that "[b]ecause a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the

7

same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, cmt. n.3(B). Application Note 3(B) further states that "[i]n order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the [district] court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." Id. Consistent with this Application Note, we have held that "[a] sentencing court must make particularized findings to support the attribution of a coconspirator's actions to the defendant as relevant conduct, whether or not the defendant asks it to do so or disputes the attribution." Figueroa-Labrada, 720 F.3d at 1264. In other words, even if the defendant does not lodge any objections to the PSR, the district court must still make these particularized findings. Id.

In this case, the district court adopted the factual findings contained in the PSR and otherwise made no independent factual findings of its own at the time of sentencing. Unfortunately, however, the factual findings contained in the PSR and adopted by the district court did not address the scope of the criminal activity that Godinez agreed to jointly undertake. Nor did the PSR's factual findings otherwise include information specifically linking Godinez to all of the quantities

8

of methamphetamine that were seized during the investigation.[2]  Consequently,

we conclude, and government counsel essentially agreed at oral argument, that the

district court erred in failing to make such findings, and that its error was plain in

light of existing Tenth Circuit precedent.

The question then becomes whether the district court's error affected

Godinez's substantial rights.  To address this question, we begin by reviewing the

allegations set forth in the charges that are encompassed by Godinez's guilty plea.

Count 1 of the indictment in this case alleged that "[b]eginning on or about June

16, 2014, and continuing until July 16, 2014," Godinez and his two codefendants

"knowingly and intentionally combined, conspired, and agreed . . . to distribute

and possess with intent to distribute more than 500 grams of a mixture and

substance containing a detectable amount of methamphetamine."  ROA, Vol. 1 at

24.  Count 2 of the indictment alleged that "[o]n or about June 17, 2014,"

Godinez "knowingly and intentionally distributed 50 grams or more of a mixture

and substance containing a detectable amount of methamphetamine."  Id. at 25.

Count 3 of the indictment alleged that "[o]n or about July 9, 2014," Godinez

"knowingly and intentionally distributed 50 grams or more of a mixture and

---

[2] In its appellate response brief, the government notes that the PSR contains the statement that "the defendant is accountable for 1.505 kilograms of 'Ice.'" Aplee. Br. at 6 (quoting ROA, Vol. 3 at 12 (PSR at ¶ 31)).  But this was not an independent, particularized finding.  At no point does the PSR differentiate between the drugs attributable to the conspiracy as a whole and those attributable to Godinez individually.

substance containing a detectable amount of methamphetamine." Id. Lastly, Count 4 alleged that "[o]n or about July 16, 2014," Godinez and his two codefendants, "aiding and abetting each other, knowingly and intentionally possessed with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine." Id.

In his petition to enter a plea of guilty, Godinez admitted all of these allegations. By doing so, Godinez admitted to distributing or possessing with intent to distribute 650 grams or more of methamphetamine. That amount greatly exceeds the specific amounts that he personally distributed to the CI on June 17 and July 9, 2014 (those two transactions totaled 172.2 grams). Thus, Godinez effectively admitted that additional amounts of methamphetamine in his possession or the possession of his codefendants, totaling approximately 478 grams or more, were attributable to him. But it does not account for all of the methamphetamine that was attributed to him by the PSR and, in turn, the district court.

At the plea hearing, the district court asked government counsel to recite the factual basis for the plea. In response, government counsel discussed the specific seizures of methamphetamine that occurred during the course of the investigation of Godinez and his codefendants. These seizures, which were subsequently listed in the PSR's factual findings, included the following:

10

| Date/Occurrence | Weight of Meth Mixture | Weight of Actual Meth |
|---|---|---|
| 6/17/14 Controlled Buy | Bag 1 - 27.79 grams | 27.3 grams |
| | Bag 2 - 28.12 grams | 27.9 grams |
| 7/9/14 Controlled Buy | Bag 1 - 54.85 grams | 52.8 grams |
| | Bag 2 - 54.67 grams | 52.9 grams |
| 7/9/14 Storage Unit Search | Crystals - 9.32 grams | 9.3 grams |
| | Bag 1 - 321.57 grams | 318.2 grams |
| | Bag 2 - 375.47 grams | 374.8 grams |
| | Bag 3 - 180.9 grams | 180.8 grams |
| 7/16/14 Search of Vehicle | 436 grams | 419.3 grams |
| 7/16/14 Search of Apartment | 16.57 grams | 16.5 grams |
| TOTALS | 1,505.26 grams | 1,479.8 grams |

Id., Vol. 3 at 12.

A portion of this methamphetamine was unquestionably attributable to Godinez. To begin with, the methamphetamine that was seized following the two controlled buys was attributable to Godinez because it is undisputed that he was the one who directly sold the methamphetamine to the CI. Similarly, the 436 grams of methamphetamine that were seized from a vehicle on July 16, 2014, were attributable to Godinez because they were the result of a one-pound methamphetamine transaction that he had verbally negotiated with the CI that day but had not yet consummated, and because the vehicle from which the methamphetamine was seized was owned by Godinez. To be sure, codefendant Cano-Bahena was actually driving the vehicle at the time the methamphetamine

11

was seized. But the record indicates that Cano-Bahena was acting as Godinez's supplier for that transaction. Lastly, the 16.57 grams of methamphetamine that were seized from Cano-Bahena's apartment later that same day also are reasonably attributable to the conspiracy outlined in the indictment. More specifically, the district court could have reasonably found that Cano-Bahena, in connection with the conspiracy, directly possessed this methamphetamine with the intent to distribute it. The district court also could have reasonably found that Godinez, in turn, constructively possessed the same methamphetamine for the same purpose. Together, these amounts total 618 grams of methamphetamine mixture or 596.7 grams of actual methamphetamine.

The more difficult question concerns the 887.26 grams of methamphetamine mixture that were seized from the storage unit on July 9, 2014. The events that led to the search of the storage unit and the seizure of the methamphetamine are described as follows in the PSR:

13.     On July 9, 2014, agents utilized the CI to make a controlled purchase of four ounces of methamphetamine for $3,600 from Godinez-Perez in Kansas City, Kansas. The CI contacted Godinez-Perez by calling cellular phone number (816) 719-XXXX. During the call, Godinez-Perez told the CI that he was still at work and would not be able to meet with [the CI] until around 6:30 p.m.

14.     Agents were conducting surveillance at XXX Central Avenue, Kansas City, Kansas, when they observed three Hispanic males leaving the apartments and driving away in a Chevrolet Trailblazer bearing Kansas license plate 201 XXX [and registered to Godinez]. Agents with HSI and KBI followed the

12

Trailblazer to a gas station in Gardner, Kansas. The Hispanic males exited the Trailblazer and were observed making phone calls on their cellular phones. A few minutes later the Hispanic males were observed driving away from the gas station and were followed to the Price Chopper in Gardner, Kansas and seen parking in the parking lot. A short time later, a black Jeep Patriot bearing Kansas license plate 826 XXX was observed slowly driving past the Trailblazer. The Trailblazer was seen backing out of the parking stall and following the Jeep Patriot to an apartment complex on East Lincoln Street in Gardner, Kansas. Four Hispanic males were observed standing near the vehicles[,] which were parked in front of one of the apartments.

15.    Agents checked the registration of the Jeep Patriot Kansas[,] license plate 826 XXX[,] and found it was for a 2014 Jeep Patriot registered to Sandra Patricia XXXXXXX of Gardner, Kansas.

16.    A few minutes later, agents observed the Chevrolet Trailblazer and Jeep Patriot leaving the apartment complex and driving to the Central Self Storage facility located at 1702 Kansas City Road in Olathe, Kansas. Agents observed the Hispanic males entering Unit 17[D]. After being at the storage unit for several minutes, both vehicles were observed leaving the facility.

17.    Agents followed the Chevrolet Trailblazer back to Central Avenue in Kansas City, Kansas[;] the Jeep Patriot was observed heading back towards Gardner, Kansas[,] and surveillance was discontinued.

18.    The CI received a phone call from Godinez-Perez indicating that he was ready to meet at the same location as before. The CI met with Godinez-Perez in a seafood restaurant parking lot located near 12th and Central Avenue, Kansas City, Kansas. The CI purchased four ounces of methamphetamine from Godinez-Perez for $3,600. During the meeting Godinez-Perez quoted the CI prices for pound and kilogram quantities of methamphetamine. A field test . . . showed a presumptive positive result for the presence of methamphetamine, weighing 56.9 and 57 grams per bag.

13

19. Agents contacted the Olathe Police Department, which agreed to use a K-9 drug detection unit to conduct an open air sniff on the Central Self Storage Units, 1702 Kansas City Road, Olathe, Kansas. The certified K-9 alerted only on storage unit 17D after sniffing several other units in the facility.

20. A search warrant was obtained for Central Self Storage Unit 17D from Johnson County, Kansas District Court. During the search of storage unit 17D, agents seized plastic bags containing 762.03 and 217.72 grams of methamphetamine. They also seized 517.09 grams of marijuana, digital scales and packaging material.

Id., Vol. 3 at 9-10. The PSR contains no other mention of the storage unit. Thus, although the information contained in the PSR would have allowed the district court to reasonably infer that the 109.52 grams of methamphetamine distributed by Godinez to the CI on July 9, 2014, originated from the storage unit, it was insufficient to allow the district court to determine who directly or constructively possessed the 887.26 grams of methamphetamine that were seized later that day by law enforcement officers during the search of the storage unit.

In an attempt to connect Godinez with the 887.26 grams of methamphetamine seized from the storage unit, the government notes that it was Godinez and Cano-Bahena who traveled from Kansas City, Kansas, to the storage unit on July 9, 2014, and obtained the 113.9 grams of methamphetamine that Godinez distributed to the CI later that day. Although the government is correct

14

on this point,[3] the government fails to acknowledge a key fact that is set forth in the PSR. Godinez and Cano-Bahena did not drive directly from the apartment to the storage unit, but instead made three intervening stops: at a gas station where they made a series of telephone calls, then at a grocery store where they were met by a Jeep Patriot, and finally at an apartment complex where they met with an unidentified Hispanic male who apparently had been driving the Jeep Patriot. Only after making those three stops did Godinez and Cano-Bahena drive to the storage unit, accompanied again by the unidentified Hispanic male driving the Jeep Patriot. All of which suggests that the storage unit may not have been owned, rented, or otherwise controlled by Godinez or a coconspirator, whether or not indicted.[4] In other words, the limited evidence contained in the record on appeal is not so one-sided that the district court would have had no choice but to attribute to Godinez, as part of the conspiracy to which he pled guilty, the 887.26 grams of methamphetamine that were stored in and seized from the storage unit.

Consequently, the record, which lacks particularized findings by the district court, does not reasonably foreclose the possibility that the 887.26 grams of

_____

[3] As noted, the PSR states only that "three Hispanic males" traveled in Godinez's vehicle from Kansas City, Kansas, to the storage unit, and does not otherwise identify those individuals. Id. In his sentencing memorandum, however, Godinez essentially conceded that he and Cano-Bahena were two of those individuals.

[4] Both in its brief and at oral argument, the government failed to identify the owner of the storage unit.

15

methamphetamine that were stored in and seized from the storage unit were not "within the scope of the criminal activity that [Godinez] jointly undertook," and thus were not attributable to him. Figueroa-Labrada, 720 F.3d at 1265.

We in turn conclude that Godinez's substantial rights were impacted by the district court's error. The PSR assigned Godinez a base offense level of 36, noting that U.S.S.G. § 2D1.1 "provides that an offense involving at least 1.5 kilograms but less than 4.5 kilograms of 'Ice' has a base offense level of 36." Id., Vol. 3 at 13. Had the PSR omitted from its relevant conduct determination the methamphetamine that was seized from the storage unit, Godinez's base offense level would have been reduced to 34 (the same base offense level that would have applied had the PSR relied solely on Godinez's admissions when he pleaded guilty). That in turn would have resulted in a total offense level of 29, and an advisory Guidelines sentencing range of 87 to 108 months, far different than the 108–to–135–month advisory Guidelines range calculated by the district court. Thus, in sum, it is apparent that the district court's error resulted in an "erroneous, and higher, Guidelines range [that] set the wrong framework for the sentencing proceedings." Molina-Martinez, 136 S. Ct. at 1345. Consistent with the Supreme Court's holding in Molina-Martinez, we conclude that this is sufficient to establish "a reasonable probability of a different outcome absent the error." Id.; see id. at 1346 ("In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range

16

has demonstrated a reasonable probability of a different outcome.").  In other words, nothing in the record in this case indicates that the district court "based the sentence [it] selected on factors independent of the Guidelines," and "the record is [also] silent as to what the district court might have done had it considered the correct Guidelines range."  Id. at 1347.

We are left only with the question of whether the district court's error seriously affects the fairness, integrity or public reputation of judicial proceedings.  We have adopted a presumption that this question must be answered in the affirmative whenever a defendant has established that an unobjected-to sentencing error affects his substantial rights.  See United States v. Sabillon-Umana, 772 F.3d 1328, 1333 (10th Cir. 2014) ("[A]n obvious misapplication of the sentencing guidelines will usually satisfy the third and fourth elements of the plain error test.").  Because Godinez has established that the district court's error in this case affected his substantial rights, the presumption thus applies. Although we have also held that this presumption can be overcome in certain instances, we conclude that "[t]his case . . . falls within the heartland of the presumption, not any exception."  Id. at 1334.  The sentence imposed by the district court—108 months—was at the very bottom of the incorrectly-calculated advisory Guidelines range, and nothing in the record indicates that the district court selected this sentence independently from the advisory Guidelines range. Further, as we have explained, the bottom of the correctly-calculated advisory

17

Guidelines range would have been 21 months lower than the sentence that was imposed by the district court. Thus, a very real possibility exists that, absent the district court's error, it would have imposed a substantially lower sentence.

For these reasons, we conclude that the case must be remanded to the district court with directions to vacate Godinez's sentence and resentence him. Before doing so, however, we proceed in the interests of judicial economy to review the remaining challenges posed by Godinez on appeal.

*Determination of relevant conduct - drug type*

As part of his first issue, Godinez argues that the district court also erred in calculating his advisory Guidelines range on the basis of Ice, rather than on the basis of a methamphetamine mixture. In support, Godinez asserts that "he admitted and was convicted of trafficking in a mixture or substance containing a detectable amount of methamphetamine." Aplt. Br. at 14. Nevertheless, he asserts, the district court performed its sentencing calculations on the basis of Ice.

Section 2D1.1 of the Sentencing Guidelines defines the term "Ice" as "a mixture or substance containing d methamphetamine hydrochloride of at least 80% purity." U.S.S.G. § 2D1.1, Notes to Drug Quantity Table, n.(C). It also provides that "[i]f a mixture of substance contains more than one controlled substance, the weight of the entire mixture of substance is assigned to the controlled substance that results in the greater offense level." Id., Notes to Drug Quantity Table, n.(A).

18

The PSR in this case, and in turn the district court, properly recognized and applied these principles. In outlining Godinez's offense conduct, the PSR included a table that listed the quantity (both "Net Weight of Methamphetamine Mixture" and "Net Weight/Actual Methamphetamine") and purity of each seizure of methamphetamine that occurred during the course of the investigation. Together, the total net weight of the methamphetamine mixture was 1,505.26 grams and the net weight/actual methamphetamine, which took into account the purity of the various quantities seized, was 1,479.8 grams. ROA, Vol. 3 at 12. The PSR in turn treated this total amount as Ice, explaining:

> Since the methamphetamine mixture is over 80% pure, it is considered "Ice" for the purposes of the guideline. USSG §2D1.1 Note to Drug Quantity Table (C). Note to Drug Quantity Table (A) indicates that the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level. Therefore, the defendant is accountable for 1.505 kilograms of "Ice."

Id. Godinez did not object to this or any other portion of the PSR. Consequently, the district court adopted these findings and determination as its own. Godinez fails to establish that this was error, let alone plain error, on the part of the district court.

*Denial of downward variance - empirical basis for drug-related Guidelines*

Godinez also argues that the district court "relied on a demonstrably wrong

19

premise to deny [his] request for a below-guideline variance." Aplt. Br. at 9. We review for an abuse of discretion a district court's decision not to grant a downward variance. United States v. Franklin-El, 554 F.3d 903, 914 (10th Cir. 2009); United States v. Smart, 518 F.3d 800, 805 (10th Cir. 2008) ("[W]hether any . . . disparity justifies a sentencing variance in a given case raises a . . . question . . . of substantive reasonableness," which we review for an abuse of discretion).

In the sentencing memorandum that he filed with the district court, Godinez argued that the Sentencing Commission did not use an "empirical approach in developing the Guidelines for drug-trafficking offenses," and instead "employed the 1986 Act's weight-driven scheme." ROA, Vol. 1 at 41 (quoting Kimbrough v. United States, 552 U.S. 85, 96 (2007)). Godinez in turn argued that he was entitled to a downward variance because "[t]he result of th[e] [Sentencing Commission's] approach, unmoored from empirical evidence or careful study, [wa]s to penalize methamphetamine much, much more severely than any other drug." Id. At the sentencing hearing, the district court stated on the record: "I think the [G]uidelines are the product of empirical research and ongoing empirical study and, while not perfect, the focus on quantity and purity of drugs does speak to a number of factors that are relevant when one considers one's relative culpability, vis-à-vis the culpability of defendants across the nation." Id., Vol. 2 at 50. Godinez now argues on appeal that the district court's statement was

20

contrary to Kimbrough and constituted reversible error.

The government argues in response that the district court's statement was not erroneous because this court has expressly recognized that "the Sentencing Commission based the drug quantities and conversion rates provided in § 2D1.1 on Congressional directives and *appropriate reliance on experts and practitioners in the field*." Aplee. Br. at 34 (emphasis added) (quoting United States v. Kort, 440 F. App'x 678, 683 (10th Cir. 2011)). But "reliance on experts and practitioners in the field" is not necessarily empirical evidence. Instead, empirical evidence is that which is "[b]ased on, concerned with, or verifiable by observation or experience rather than theory or pure logic." Empirical Evidence, Oxford Dictionaries Online (2016), http://www.oxforddictionaries.com/us/definition/american_english/empirical. Thus, in the sentencing context, empirical evidence would be that "derived from the review of . . . individual sentencing decisions." Gall v. United States, 552 U.S. 38, 46 (2007). Perhaps the "experts and practitioners" that the Sentencing Commission sought guidance from themselves relied on their own review of individual sentencing decisions; but that much is not clear from our decision in Kort. Thus, contrary to the government's assertions, our decision in Kort does not support the district court's statements in this case.

The fact of the matter is that, in large part, "the Guidelines are . . . the product of careful study based on extensive empirical evidence derived from the

21

review of thousands of individual sentencing decisions." Id.; see U.S.S.G. ch. 1, pt. A1, § 3 (discussing how the Sentencing Commission took an "an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice"). But "not all of the Guidelines are tied to this empirical evidence." Gall, 552 U.S. at 46 n.2. "For example," the Court noted, "the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes." Id. (citing U.S.S.G. § 1A1.1 (Nov. 2006)).

Returning to the district court's challenged statement, it is unclear whether its reference to "the [G]uidelines [being] the product of empirical research and ongoing empirical study" was intended to refer to all of the Guidelines, including § 2D1.1 and its drug quantity table, or whether, instead, it was intended as a general reference to most of the Guidelines. Thus, it is simply unclear whether the district court's statement was erroneous or not.

Assuming, for purposes of argument, that the district court's statement was intended to refer to all of the Guidelines and was thus erroneous, the question becomes whether that erroneous statement had any impact on the district court's decision to deny Godinez's request for a downward variance. The district court expressly noted at the time it made the challenged statement that it was "rejecting" Godinez's request for a downward variance to the extent it was based

22

on Godinez's "arguments that pertain[ed] to the [S]entencing [G]uidelines themselves and the [G]uidelines['] focus on the purity of the drug." ROA, Vol. 2 at 50. The district court explained:

> [W]hile not perfect, the [Guidelines'] focus on quantity and purity of drugs does speak to a number of factors that are relevant when one considers one's relative culpability, vis-á-vis the culpability of defendants across the nation. For example, the pure—the more pure the drug, the closer to the source. The quantity of the drug, you know, is a direct reflection of the size of the organization or at least the complexity or the opportunity that organization has to distribute large quantities of drugs.
>
> The [G]uidelines view some organization or person that is able to deal in large quantity– quantities of drugs, of course, having more significant and adverse effect on the community than one that deals in small amounts and only has access to small amounts. And as the government argued, the facts in this case illustrate that Mr. Godinez, as well as his co-defendants, were able to—to deal in sizable quantities of drugs, at least in the pound quantities, if not the kilogram quantities, and were willing to start, you know, two, four ounces of methamphetamine at a time. And the methamphetamine was almost pure, 98 percent. All of which, of course, suggests that they are players in an organization that is a significant organization and has access to big quantities of drugs and pure quantities of drugs relatively close to the ultimate source of the methamphetamine.

Id. at 50-51. Nothing about this statement is erroneous, and Godinez does not suggest otherwise. Nor does Godinez argue that the district court abused its discretion in concluding that the amount and purity of the methamphetamine involved in this case was relevant for purposes of determining Godinez's relative role in the conspiracy at issue.

23

## III

The case is REMANDED to the district court with directions to VACATE Godinez's sentence and resentence him.