**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 2, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GILBERTO CANO-BAHENA,

Defendant - Appellant.

No. 16-3298
(D. C. No. 2:14-CR-20066-JAR-2)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **McHUGH**, and **MORITZ**, Circuit Judges.

Defendant Gilberto Cano-Bahena pleaded guilty to one count of aiding and

abetting a codefendant in knowingly and intentionally possessing with the intent to

distribute five grams or more of methamphetamine, in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(b), and 18 U.S.C. § 2. Cano-Bahena then unsuccessfully moved to

withdraw his plea. Thereafter, he was sentenced to a term of imprisonment of 108

months, to be followed by a four-year term of supervised release. Cano-Bahena now

appeals, challenging the district court's denial of his motion to withdraw his plea, as well

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

as two aspects of his sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

*Factual background*

In June and July 2014, law enforcement agents from the Kansas Bureau of Investigation and the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (DHS) used a confidential informant (CI) to make two controlled purchases of methamphetamine from an individual named Emanuel Godinez-Perez in Kansas City, Kansas. Law enforcement agents subsequently arrested Godinez-Perez, along with Cano-Bahena and Jose Menera-Alvarez, both of whom were involved with Godinez-Perez in the distribution of the methamphetamine. During the course of the investigation, law enforcement agents seized ten different quantities of methamphetamine, totaling approximately 1,505.26 grams. Laboratory testing revealed that these quantities of methamphetamine ranged in purity from 96.1% to 100% pure. Based upon these purity figures, the net weight of the methamphetamine was estimated to be 1,479.8 grams.

*Procedural background*

On July 25, 2014, a criminal complaint was filed against the three men. Of relevance here, Count One of the complaint charged all three with conspiring to distribute and possess with the intent to distribute more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(A)(viii), and 18 U.S.C. § 2, and Count Four charged all three with possession with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), and 18 U.S.C. § 2.

On August 6, 2014, a federal grand jury returned an indictment that essentially mirrored the criminal complaint.

On May 27, 2015, Cano-Bahena entered a plea of guilty, pursuant to a two-page written plea agreement, to one count of aiding and abetting Menera-Alvarez in knowingly and intentionally possessing with the intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(b), and 18 U.S.C. § 2.[1]

A presentence investigation report (PSR) was prepared and submitted to the district court and the parties on July 1, 2015. The PSR imposed a base offense level of 36 because the "offense involv[ed] at least 1.5 kilograms but less than 4.5 kilograms of 'Ice.'" ROA, Vol. III at 12. The PSR in turn applied a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.2 due to Cano-Bahena having eluded the police prior to his arrest, as well as a total three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, resulting in a total offense level of 35. That total offense level, combined with Cano-Bahena's criminal history score of one and criminal history category of I, resulted in an advisory Guidelines imprisonment range of

_____

[1] As part of the plea deal, the government filed an information charging Cano-Bahena with this single count, and in turn dismissed the remaining counts of the indictment. Dist. Ct. Docket No. 73 (information).

168 to 210 months.

Cano-Bahena objected to the PSR's proposed obstruction-of-justice enhancement pursuant to § 3C1.2. He also objected to the PSR "attribut[ing] the full 1505.39 grams of methamphetamine to him." Id. at 23. In support, Cano-Bahena argued that it was not him, but rather Godinez-Perez, who was involved in the controlled buys. Cano-Bahena further argued that only 453 grams of methamphetamine were actually connected to him as a result of the searches of his apartment and vehicle. The probation officer responded to this latter objection by noting that Cano-Bahena and "Godinez-Perez were working together to sell methamphetamine" and that "[t]he trafficking of all the methamphetamine involved in this case was (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity for" Cano-Bahena. Id. at 26.

On March 22, 2016, Cano-Bahena filed a motion to withdraw his guilty plea. In his motion, Cano-Bahena asserted that his plea was not knowing and voluntary because "none of the [relevant] documents were fully translated and explained to [him] before he signed the same and entered into his plea." ROA, Vol. I at 90. Cano-Bahena further asserted that he had "[o]riginally . . . agreed with the government o[n] a 100 month sentence," and that under the final agreement "his understanding [was] that his new sentence would be less than that which led to his accepting the same." Id.

On April 13, 2016, the district court held a hearing on Cano-Bahena's motion to withdraw his guilty plea. The government presented testimony from James Campbell,

4

who was originally appointed to represent Cano-Bahena and who represented him at the time of his plea agreement.[2] Campbell testified that Cano-Bahena was originally offered a 100-month Rule 11(c)(1)(C) plea offer, but that Cano-Bahena rejected that offer on multiple occasions. ROA, Vol. II at 10–11. Campbell further testified that Cano-Bahena, "after extended discussions, indicated he would just like to enter a plea to [the proposed amended charge] without th[e] (c)(1)(C) constraint." Id. at 12. Campbell indicated that Cano-Bahena did so because the "lesser charge" contained in the "amended information . . . would include a penalty range from five to 40 years, as opposed to the 10 to life that he was looking at under the original conspiracy charge." Id. Campbell testified that he relayed this information to the prosecutor, who then offered a Rule 11(c)(1)(C) plea deal of 85 months. According to Campbell, Cano-Bahena "declined that offer and wanted to go forward with the open plea." Id. at 13. Campbell testified that the prosecutor agreed to the open plea and the parties subsequently entered into that agreement. Campbell in turn testified that he and an interpreter met with Cano-Bahena on the morning before he entered his guilty plea and translated the plea agreement and the amended information to Cano-Bahena. According to Campbell, he specifically informed Cano-Bahena that "whether he was charged with a conspiracy with a sentencing range of 10 to life or he was charged in the . . . lesser information, with five to 40, that the attribution could come out identically," meaning that "the application of the sentencing guideline might give him

---

[2] Cano-Bahena successfully moved, after entering into the plea agreement and receiving a copy of the PSR, to substitute Campbell with another appointed counsel.

exactly the same sentence." Id. at 18. Campbell testified that, after doing so, he was satisfied that Cano-Bahena entered into the plea knowingly and voluntarily. Lastly, Campbell testified that Cano-Bahena "really trusted the judge and he thought the judge would give him a better number than what [Campbell] and [the prosecutor] had agreed to" in the original Rule 11(c)(1)(C) proposals. Id. at 21.

After hearing Campbell's testimony, the district court analyzed the factors that we have outlined for determining whether there is a fair and just reason for withdrawal of a plea. Id. at 37. To begin with, the district court noted that Cano-Bahena "acknowledge[d] that he [wa]s not claiming actual innocence to the charge that he pled guilty to." Id. Second, the district court noted "[t]here really [wa]s no suggestion that . . . Campbell rendered ineffective assistance of counsel" to Cano-Bahena. Id. at 38. Third, the district court noted that "[t]he colloquy during the plea hearing itself . . . illustrate[d] that . . . Cano[-Bahena] did all of this knowingly and voluntarily." Id. at 40. The district court also found that Cano-Bahena had "close assistance of counsel" in entering into his plea. Id. at 46. Lastly, the district court stated that it did not place any weight on the factors of whether withdrawal would substantially inconvenience the court or waste judicial resources. Id. Ultimately, the district court concluded that there was no "fair and just reason to allow the withdrawal of this plea" and therefore denied Cano-Bahena's motion. Id.

On September 26, 2016, the district court held a sentencing hearing for Cano-Bahena. Defense counsel noted at the outset that the parties had "reached an

agreement on the amount of drugs attributable to [Cano-Bahena] as far as relevant conduct," and that "the only issue left in [their] objections [wa]s the enhancement for the obstruction charge." Id. at 52. Defense counsel further explained that the parties agreed "that . . . Cano-Bahena should be responsible for approximately 453 grams of methamphetamine," which included 436 grams seized from his vehicle and "17 grams that were found at his apartment pursuant to a consensual search." Id. at 53. This amount, both defense counsel and the prosecution agreed, would result in a base offense level of 32, rather than the base offense level of 36 that was proposed in the PSR. Id. at 54.

As for the obstruction of justice enhancement, the government presented testimony from Benjamin Gatrost, a DHS special agent. Gatrost testified that he was involved in the arrest of Cano-Bahena on July 16, 2014. Gatrost explained how Cano-Bahena led officers on a high-speed chase and attempted to elude them prior to his arrest. Based upon Gatrost's testimony, the district court found that Cano-Bahena knew that he was being followed by law enforcement officers and attempted to evade them by "engag[ing] in very serious behavior that placed anyone along those residential streets at risk of death or serious bodily injury." Id. at 76. Consequently, the district court overruled Cano-Bahena's objection to the PSR's proposed obstruction of justice enhancement.

After applying a base offense level of 32, imposing a two-level enhancement for obstruction of justice, and allowing a three-level decrease for acceptance of responsibility, the district court arrived at a total offense level of 31. That total offense

level, combined with Cano-Bahena's criminal history category of I, resulted in an advisory Guidelines sentencing range of 108 to 135 months. The government recommended that Cano-Bahena be sentenced to a term of imprisonment of 108 months. The government based its recommendation on the fact that Godinez-Perez received a sentence of 108 months and Menera-Alvarez received a sentence of 100 months. Cano-Bahena's counsel asked for a below-Guidelines sentence, arguing that Cano-Bahena's "participation in this particular matter was minimal" and "he was not as culpable as the other two co-defendants." Id. at 83.

The district court ultimately imposed a sentence of 108 months' imprisonment, to be followed by a four-year term of supervised release.

Judgment was entered in the case on September 26, 2016. Cano-Bahena now appeals.

## II

Cano-Bahena raises three issues on appeal. First, he argues that the district court erred in denying his motion to withdraw his guilty plea. Second, he argues that the district court erred in finding that he eluded the police and in turn imposing the two-level enhancement for obstruction of justice. Third, he argues that the 108-month sentence imposed by the district court is substantively unreasonable because his sentence is the same as or longer than his codefendants, both of whom had more substantial roles in the offense than he did. As discussed below, we conclude that all three of these issues lack merit.

*Denial of motion to withdraw guilty plea*

Cano-Bahena argues that the district court erred in denying his motion to withdraw his guilty plea. "Whether to permit withdrawal 'always and ultimately lies within the sound discretion of the district court to determine on a case by case basis when the standard is and isn't met.'" United States v. Sanchez-Leon, 764 F.3d 1248, 1259 (10th Cir. 2014) (quoting United States v. Soto, 660 F.3d 1264, 1267 (10th Cir. 2011)). "'Although a motion to withdraw a plea prior to sentencing should be freely allowed, we will not reverse a district court's decision unless the defendant can show that the court acted unjustly or unfairly.'" Id. (quoting United States v. Hamilton, 510 F.3d 1209, 1213–14 (10th Cir. 2007)). Thus, we review for abuse of discretion a district court's denial of a motion to withdraw a guilty plea. Id. In doing so, we "review [any underlying] legal conclusions de novo, such as whether the plea was made knowingly and voluntarily," and we "review factual findings for clear error." Id.

"A defendant may withdraw a guilty plea" after it has been accepted by the district court and "before sentencing if he 'can show a fair and just reason for requesting the withdrawal.'" Id. at 1258 (quoting Fed. R. Crim. P. 11(d)(2)(B)). A district court's decision whether to grant a motion to withdraw a guilty plea should be guided by the consideration of the following factors: "'(1) whether the defendant has asserted his innocence, (2) prejudice to the government, (3) delay in filing defendant's motion, (4) inconvenience to the court, (5) defendant's assistance of counsel, (6) whether the plea is knowing and voluntary, and (7) waste of judicial resources.'" Id. (quoting Hamilton, 510

9

F.3d at 1214). We have also suggested that a district court may consider one additional factor, i.e., the likelihood of conviction Id.

If a defendant "fails to carry his or her burden on asserted innocence, validity of the plea (whether it was given knowingly and voluntarily), and ineffective assistance of counsel," it is unnecessary for a district court to "address 'the remaining factors . . . because these [remaining] factors speak to the potential burden on the government and the court, rather than the defendant's reason for withdrawal.'" Id. (quoting Hamilton, 510 F.3d at 1217 (emphasis omitted)). In other words, "even if these [remaining] factors weigh in a defendant's favor, they cannot establish a fair and just reason for withdrawal." Hamilton, 510 F.3d at 1217.

Focusing on these three key factors, we note that Cano-Bahena has never claimed that he is actually innocent. Instead, Cano-Bahena's primary argument is that his plea "was not knowing and therefore not voluntary." Aplt. Br. at 7. Although Cano-Bahena concedes "that the plea agreement he signed and the statements he gave at his plea hearing at first blush indicate he gave a plea that was both knowledgeable and voluntary," he asserts that "this 'new' plea was entered into on the morning of the plea acceptance and none of the documents were fully translated and explained to [him] before he signed the same and entered into his plea." Id. at 10. Cano-Bahena also argues, for the first time, that his counsel was ineffective during the brief period leading up to the entry of the plea because counsel failed to ensure that Cano-Bahena understood the terms of the plea.

We conclude that Cano-Bahena's arguments are refuted entirely by the record in

10

this case.  Cano-Bahena's counsel at the time of the plea agreement, James Campbell, testified that on the morning of the plea, he was "given a copy of an amended information and a waiver of preliminary relative to that information" and he "had those translated for [Cano-Bahena] and asked if there were any questions or anything he had about those." ROA, Vol. II at 14–15.  Campbell testified that "there was [then] a very brief plea agreement provided" and he "had that plea agreement translated for [Cano-Bahena] and read to him, and then [they] went through each of the paragraphs of that plea agreement and discussed that before [they] came up to visit with the Court later that day."  Id. at 15. Campbell emphasized that "[a]ll of the documents were completely translated" for Cano-Bahena.  Id. at 16.  Campbell testified that he was satisfied that Cano-Bahena "was entering into the plea . . . knowingly and voluntarily."  Id. at 17.  He explained that he and Cano-Bahena "had spent extended time going over this case and additionally going through the United States Sentencing Guidelines and the impacts of those."  Id.  Campbell also testified that they "had the added advantage of the co-defendant [Godinez-Perez]" having "entered a plea well before" Cano-Bahena,[3] and that this gave them "a pretty good idea of what the attribution potentially was going to be" for Cano-Bahena.  Id.  Campbell testified that he "specifically remember[ed]" explaining to Cano-Bahena that "the attribution could come out identically" between the original charges and the charge in the lesser information.  Id. at 17–18.  "In other words," Campbell testified, he explained to Cano-Bahena that "the application of the sentencing guideline might give him exactly the

_____

[3] Godinez-Perez entered his plea of guilty on January 22, 2015.

11

same sentence." Id. at 18. According to Campbell, all of these communications occurred between approximately 8:15 a.m. and 10:34 a.m. on the morning of May 27, 2015, when Cano-Bahena entered his guilty plea. During that time, Campbell testified, he spent approximately thirty minutes going over the plea agreement, the amended information, and the factual basis with Cano-Bahena. Campbell explained that he and Cano-Bahena had, prior to that day, "gone over [other] plea agreements," as well as "a proposed factual basis which wound up being the same for both factual bases." Id. at 27.

After hearing Campbell's testimony, the district court "f[ou]nd that . . . Campbell . . . render[ed] effective assistance of counsel to [Cano-Bahena] in all respects." Id. at 38. In particular, the district court found that Campbell "conveyed all plea negotiations to" Cano-Bahena and in turn "discussed [the] plea offers with him." Id. The district court further found that Campbell and Cano-Bahena discussed "at length sentencing and how that would work and how it would be left up to the judge ultimately." Id.

The district court also emphasized that "[t]here really [wa]s no suggestion" by Cano-Bahena that "Campbell rendered ineffective assistance of counsel."[4] Id. "Rather," the district court stated, "the assertion I think is more along the lines that [Cano-Bahena's] decision to enter a plea on May 27th was not a knowing and voluntary decision and was the product of being rushed into making a decision on that day." Id. at

_____

[4] At best, Cano-Bahena asserted in his motion to withdraw that his "prior counsel . . . may have not relayed all information to [Cano-Bahena] that was needed to effectuate a plea that was knowing and voluntary." ROA, Vol. I at 91. He failed, however, to support that allegation with any evidence.

12

38–39. The district court rejected that assertion, however, noting "that for over an hour, probably closer to two hours," on the morning of May 27, 2015, "Campbell spent time with [Cano-Bahena] discussing the latest plea offer, one that was framed around what [Cano-Bahena] had said he wanted." Id. at 39. In addition, the district court noted that "it was a very short plea agreement" (one page plus a signature line) that "did not include a waiver of appellate rights" or "a number of the provisions that the government often negotiates in plea agreements that are to the government's advantage and not the defendant's advantage." Id. The district court found "that spending an hour-and-a-half or so explaining these documents, having the interpreter read them and—and translate them word-by-word was a sufficient amount of time, particularly in the context of the fact that . . . Campbell had been discussing plea offers and plea negotiations with [Cano-Bahena] for sometime over the course of—sometime before May 27th." Id. at 40. Lastly, the district court found that "[t]he colloquy during the plea hearing itself . . . illustrate[d] that [Cano-Bahena] did all of this knowingly and voluntarily." Id. In particular, the district court noted that it had "discussed the process [it] would use to determine an appropriate sentence" and emphasized to Cano-Bahena that it "did not have to take anyone's recommendations . . . about sentencing." Id. at 44–45. In sum, the district court found "there was a very full record and a very full discussion with [Cano-Bahena] that convinced [it] then and still convince[d] [it] that [Cano-Bahena] entered his plea on a knowing and voluntary basis." Id. at 45.

Notably, Cano-Bahena makes no serious attempt in this appeal to challenge any of

13

the district court's factual findings. And, by failing to do so, Cano-Bahena clearly cannot prevail on his claims that his counsel was ineffective or, in turn, that his guilty plea was not knowing or voluntary. All of which means that Cano-Bahena has failed to establish that the district court abused its discretion in denying his motion to withdraw his guilty plea.

### *Obstruction of justice enhancement*

In his second issue on appeal, Cano-Bahena argues that his sentence is procedurally unreasonable because the district court erred in imposing a two-level enhancement pursuant to U.S.S.G. § 3C1.2 for obstruction of justice. We review challenges to the procedural reasonableness of a sentence for an abuse of discretion. United States v. Singer, 825 F.3d 1151, 1156 (10th Cir. 2016). In doing so, we also review for clear error any factual findings made by a district court that allegedly supported its application of a challenged enhancement. United States v. Simpson, 845 F.3d 1039, 1063 (10th Cir. 2017).

Section 3C1.2, entitled "Reckless Endangerment During Flight," states: "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels." U.S.S.G. § 3C1.2.

Cano-Bahena argues that § 3C1.2 must be construed to require "that a defendant . . . know that the person pursuing him is a law enforcement officer." Aplt. Br. at 17. He in turn argues that "[t]he evidence adduced at the sentencing hearing" failed to establish

14

that he was aware he was being followed by law enforcement officers or that he knowingly attempted to elude them. Id. at 16. Cano-Bahena concedes that he "drove thr[ough] a residential neighborhood in Kansas City, Kansas at a high rate of speed and rolling stop signs etc." with "methamphetamine in his vehicle." Id. Cano-Bahena further concedes "that he was being followed by [law enforcement] agents in an unmarked vehicle and at some point a Kansas City Kansas patrol car" that "made a u-turn and followed [him]." Id. But he argues that the unmarked vehicle "had no emergency lights or sirens to signify that it was law enforcement." Id. He further argues that the marked patrol car "was further back and at no time activated its emergency lights or sirens." Id. at 16-17. And, he argues, "there was no evidence [the marked patrol car] was ever in [his] field of vision" as he was driving. Id. at 16. Lastly, Cano-Bahena notes that "at the end of his drive [he] parked his vehicle and went into an outdoor restaurant and ordered a beer." Id. at 17. It was there, Cano-Bahena notes, where law enforcement officers arrested him without incident.

Cano-Bahena fails, however, to mention evidence that was key to the district court's determination. At the sentencing hearing, the government presented testimony from Benjamin Gatrost, a special agent employed by DHS. Gatrost testified that he and another DHS agent, Joseph Stewart, surveilled Cano-Bahena for several hours using an unmarked vehicle. During that time period, Gatrost testified, Cano-Bahena "follow[ed] routine traffic patterns and speeds." ROA, Vol. II at 61. Gatrost testified that at some point the decision was made to stop Cano-Bahena "based on a traffic infraction that had

15

been viewed." Id. at 57. Because the DHS agents lacked authority to conduct a traffic stop, the Kansas City, Kansas police department was contacted to assist with the stop. Gatrost testified he observed Cano-Bahena's vehicle traveling northbound on Central Avenue and that a marked Kansas City, Kansas police car passed by Cano-Bahena's vehicle headed southbound on Central Avenue, and then made a u-turn in order to follow and stop Cano-Bahena. Gatrost further testified that before the marked police car could completely turn around, Cano-Bahena's vehicle began driving recklessly and at a high rate of speed. According to Gatrost, his partner responded by stating "over the radio, 'It looks like he's running.'" Id. at 59.

The district court in turn made the following factual findings based upon Gatrost's testimony:

> And the circumstantial evidence here is that for about two hours [Cano-Bahena] was under surveillance and was engaging in rather normal driving with some minor infractions, such as failing to maintain a lane, failing to use a turn signal. But that behavior changed dramatically right at the point that a Kansas City, Kansas police car did a U-turn in an intersection and attempted to follow him.
>
> So the behavior comparing is two hours of rather normal driving with minor traffic infractions versus a matter of a few minutes of much different driving behavior in a residential neighborhood, exceeding speeds of 60 miles an hour, running multiple stop signs. * * *
>
> And I think it's notable that this dramatic behavior started at the time the Kansas City, Kansas police car did a U-turn. And obviously, you know, again, what [Cano-Bahena] saw at that point can only be proven by circumstantial evidence, not by direct evidence. But it's reasonable that that was what prompted his behavior change.

16

And when I consider that in conjunction with when the behavior stopped, when did he decide to stop the car? Well, it was at the point when the—Special Agent Gatrosts's [sic] vehicle had lost sight of him. That indicates to me that [Cano-Bahena] was aware that this other vehicle was following him, had been aware that the marked vehicle was attempting to follow him. And the fact that he didn't continue to go and drive fast and continue to engage in lots of turns and running through stop signs after Special Agent Gatrost's car was no longer in view I think is as significant as the fact that he began that behavior at the time the marked police car did a U-turn in the middle of an intersection.

So I think by a preponderance of the evidence, the government has established circumstantial evidence of [Cano-Bahena's] knowledge that he was being followed by law enforcement. And in the course of fleeing from law enforcement and attempting to evade law enforcement, he did engage in very serious behavior that placed anyone along those residential streets at risk of death or serious bodily injury.

Id. at 74–76.

Cano-Bahena makes no attempt to challenge the district court's finding that his reckless driving was prompted by him observing the marked police vehicle pass him and immediately make a u-turn in order to follow him. And, in any event, the district court's finding is amply supported by Gatrost's undisputed testimony. Thus, in sum, the district court's factual findings underlying the obstruction-of-justice enhancement were not clearly erroneous and, accordingly, we conclude it did not abuse its discretion in applying the obstruction of justice enhancement pursuant to § 3C1.2.

17

*Substantive reasonableness challenge to sentence*

In his third and final issue on appeal, Cano-Bahena argues that the district court erred in sentencing him to a term of imprisonment of 108 months because the "sentence was as great or greater than his codefendants whose roles in the crime w[ere] greater than" his. Aplt. Br. at 19. More specifically, Cano-Bahena argues that his sentence is "in contravention of 18 U.S.C. § 3553(a)(6) which states that [']The court, in determining the particular sentence to be imposed, shall consider—the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" Id. at 20.

"'Substantive reasonableness involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).'" United States v. Craig, 808 F.3d 1249, 1261 (10th Cir. 2015) (quoting United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)). "[W]e review a sentence for substantive reasonableness 'under a deferential abuse-of-discretion standard.'" Id. (quoting United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1214 (10th Cir. 2008)). "'[A] within-Guidelines sentence is entitled to a presumption of substantive reasonableness on appeal.'" Id. (quoting Alapizco-Valenzuela, 546 F.3d at 1215). Further, "we will find an abuse of discretion only if the district court was arbitrary, capricious, whimsical, or manifestly unreasonable when it weighed the permissible § 3553(a) factors." Id. (internal quotation marks omitted).

18

Section 3553(a) requires a district court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2). 18 U.S.C. § 3553(a). These purposes include "the need for the sentence imposed . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "(B) to afford adequate deterrence to criminal conduct"; "(C) to protect the public from further crimes of the defendant"; and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). "[I]n determining the particular sentence to be imposed," a district court "shall consider" a number of factors, including, as relevant here, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In this case, Cano-Bahena's counsel argued at the time of sentencing that the district court should vary downward from "the low end of the guideline range" because of what he characterized as Cano-Bahena's "minimal" participation in the offense compared to that of his two codefendants. ROA, Vol. II at 82-83. In support, Cano-Bahena's counsel argued that codefendant Godinez-Perez was the main focus of the government's investigation and received a 108-month sentence.[5] Cano-Bahena's counsel also noted

_____

[5] Approximately three months after Cano-Bahena was sentenced, we concluded that the district court erred in calculating the amount of methamphetamine that was attributable to Godinez-Perez and, consequently, we remanded his case to the district court with directions to vacate his sentence and resentence him. United States v. Godinez-Perez, 864 F.3d 1060, 1071 (10th Cir. 2016). On remand, the district court

that codefendant Menera-Alvarez "was a supplier" and received a 100-month sentence.

Id. at 83.  Lastly, Cano-Bahena's counsel argued that Cano-Bahena "didn't really

understand what the scope of this conspiracy was" and was simply "a courier on this one

afternoon," i.e., the afternoon of his arrest.  Id.

The district court largely rejected these arguments.  In particular, the district court

rejected the argument that Cano-Bahena's "sentence should be less than" his two

codefendants.  Id. at 86.  The district court explained:

> [I]t's clear to me that this wasn't just a one-time occasion when
> [Cano-Bahena] was in possession of a pound of methamphetamine to
> deliver.  First of all, it's highly unlikely that someone that had no
> involvement otherwise or no knowledge as to what was going on would be
> entrusted their very first time with a pound of methamphetamine to deliver.
>
> But more importantly, [Cano-Bahena] was driving [Godinez-
> Perez's] Trailblazer which had been under surveillance in other
> transactions, that car had been used.  Not that it was [Cano-Bahena] driving
> it, but that car was being used for other drug transactions.  And there were
> 454 grams of methamphetamine found in the vehicle on that day that
> [Cano-Bahena] was driving it, along with three cell phones, which is some
> indication of involvement with others in drug trafficking.  Also, the
> apartment where [Cano-Bahena] lived, there were 17 grams of
> methamphetamine, six more cellular phones, and digital scales and drug
> paraphernalia, which is indicative of a longer involvement than just a
> one-time incident on that day.
>
> Also, one of the $100 bills that was used as buy money was found in
> [Cano-Bahena's] possession.  And while the presentence report doesn't say
> how much, [Cano-Bahena] was found to be in possession of a large amount
> of U.S. currency when he was being booked.  So all of this points to, in my

resentenced Godinez-Perez to a term of imprisonment of 87 months.  These
circumstances do not alter our analysis of Cano-Bahena's challenge to the substantive
reasonableness of his sentence.

mind, [Cano-Bahena's] culpability being average, just as [Godinez-Perez's] was. And an equivalent sentence, I think, all things considered, is fair.

Id. at 86–87.

Cano-Bahena does not seriously dispute the district court's findings on this point and, in any event, we conclude that the record on appeal amply supports the district court's findings, including the reasonable inferences that it drew from the circumstantial evidence. In particular, we conclude that Cano-Bahena's possession of a pound of methamphetamine reasonably permitted the district court to infer that Cano-Bahena's involvement in the conspiracy extended beyond simply performing a one-time delivery. Consequently, we conclude that the district court did not abuse its discretion in sentencing Cano-Bahena to a term of imprisonment of 108 months, and we reject Cano-Bahena's argument that his sentence is substantively unreasonable.

### III

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge